CLERK'S OFFICE
A TRUE COPY
May 22, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☑ Original    ☐ Duplic

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>records and information associated with the cellular telephone assigned call numbers: ("Target Cellphone 1"): (414) 629-2275 and ("Target Cellphone 2"): (414) 788-5776. These records are stored at premises controlled by T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. | )<br>)<br>)<br>)   Case No.   **24-M-429 (SCD)**<br>)<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____6-5-24_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    **X** at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Stephen C. Dries_____.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for __30__ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    _____5-22-24. 9:50 am_____

*Judge's signature*

City and state:    _____Milwaukee, WI_____    Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call numbers: (**"Target Cellphone 1"**): (414) 629-2275 and (**"Target Cellphone 2"**): (414) 788-5776. These records are stored at premises controlled by T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

19

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

All records and information on the Devices described in Attachment A that relate to a violation of Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), including for the following time periods:

**Target Cellphone 1** – February 1, 2024, to present for Account listed Attachment A,

**Target Cellphone 2**- May 1, 2024, to present for the Account listed Attachment A;

**A. <u>Subscriber Information and Call Detail Records:</u>** The following information about the customers or subscribers of the Accounts listed Attachment A:

1. Subscriber/customer names (including usernames and screen names);

2. Subscriber/customer addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long-distance call detail and tolls records for the Account;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

20

7. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

B. **<u>Cell-Site/Tower Records:</u>** All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account listed in Attachment A, including:

1. Records of user activity for each connection made to or from the Account, including log files; text messaging logs; the date, time, length, and method of connections; data transfer volume; usernames; and source and destination Internet Protocol addresses (IPV6 data records);

2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as the source and destination telephone numbers, email addresses, and IP addresses); and

3. All data regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received;

4. All historical GPS or other precision location information associated with the Account listed in Attachment A, including Per Call Measurement Data (PCMD), Range to Tower/Real-Time Tool (RTT) data, NELOS records, and Timing Advance Data (TrueCall)).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of the violation of federal law regarding the use of fire to damage property affecting interstate commerce in violation of Title 18, United States Code, Section 844(i).

21



CLERK'S OFFICE
A TRUE COPY
May 22, 2024
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

<table>
<tr><td>In the Matter of the Search of<br><i>(Briefly describe the property to be searched<br>or identify the person by name and address)</i><br><br>records and information associated with the cellular telephone assigned call numbers: ("Target Cellphone 1"): (414) 629-2275 and ("Target Cellphone 2"): (414) 788-5776. These records are stored at premises controlled by T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 24-M-429 (SCD)</td></tr>
</table>

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Please see Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §§ 844(i) | use of fire to damage property affecting interstate commerce |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.



*Digitally signed by RICKY HANKINS DN: c=US, o=U.S. Government, ou=Dept of Justice, ou=ATF, cn=RICKY HANKINS, 0.9.2342.19200300.100.1.1=15001001699456 Date: 2024.05.21 11:33:10 -05'00'*

_____
*Applicant's signature*

Rick Hankins, Special Agent - ATF
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: __5-22-24__

_____
*Judge's signature*

City and state: __Milwaukee, WI__       Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant for records and information associated with the following cellular telephone numbers (**"Target Cellphone 1")**: (414) 629-2275 and **("Target Cellphone 2"**): (414) 788-5776. These records are stored at premises controlled by T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054, also described in Attachment A.  The information to be searched is described in the following paragraphs and in Attachment B.

2.       This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Provider to disclose to the government subscriber/call detail information and historical location data (including cell-site data) maintained by the Provider as further described in Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3.       Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce) have been committed by **Michael SALINAS and Arnold HOWARD**.  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

4.       The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court

1

of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

5.      I am a Special Agent of the U.S. Department of Justice's ATF, currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with the ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

6.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various legal courses related to constitutional law as well as search and seizure authority.  Additionally, I have received training on how to conduct various tasks associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

7.      In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 305 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,690 class hours of fire-related training. Furthermore, I have been an instructor regarding fire-related topics on multiple occasions for many agencies and institutions in several states. I have also participated in over 225 live fire training exercises, where

2

I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from approximately August 2015, to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

8. This affidavit is based upon my personal knowledge as well as information provided to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience. Through my experience and training as a firearm and arson investigator, I am aware that electronic devices, such as cellphones, can be used to store and save audio, video, and text files that can link to a variety of criminal activity. I am also aware that smart cellphones are capable of capturing location history for the device. I have previously applied for and received search and arrest warrants related to the crimes of arson and unlawful firearm possession, as well as other crimes. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

9. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

3

**PROBABLE CAUSE**

10.     On May 7, 2024, the Milwaukee Police Department (MPD) responded to a fire scene at XXXX North 67th Street, Milwaukee, Wisconsin (MPD case #C24-05070161). The fire had been extinguished by an occupant of the building prior to the arrival of police.  The responding officer observed fire damage to the front door and its surrounding areas.  The officer also reportedly smelled an odor consistent with the presence of gasoline.

11.     XXXX North 67th Street was a two-unit rental apartment building with an upper unit and a lower unit.

12.     The tenant of the upper unit, C.E., was not home at the time of the fire and called police after they arrived home.  C.E. subsequently told MPD that they believed their ex-boyfriend, **Michael SALINAS** (W/M, DOB: XX/XX/1994) was responsible for setting the fire because SALINAS found out that C.E. had aborted a pregnancy for which SALINAS would have been the likely father.  C.E. identified their cellphone number as (414) 243-2847.

13.     C.E. initially told MPD that SALINAS had never lived at XXXX North 67th Street. However, in a later interview with ATF, C.E. admitted that SALINAS had lived at their apartment from approximately 4/02/2024 – 4/30/2024.  C.E. said they lied about SALINAS living at that location because SALINAS living there violated the rules related to their renter's assistance and they did not want to risk losing their renters assistance funding.

14.     During their interview by MPD, C.E. provided the following information:

15.     C.E. said SALINAS called them at 12:22PM on 5/07/2024 from a restricted number and stated, "…that's what you on" and C.E. hung-up.  C.E. stated SALINAS called them multiple times from <u>multiple restricted and unrestricted</u> phone numbers on May 7, 2024.  The unrestricted phone numbers that SALINAS used to call C.E. were (414) 368-0854 **[a Textnow**

4

**number]**, (414) 316-0282 **[a Verizon number]**, (414) 307-8035 **[a Spectrum number]**, and (414) 567-8527 **[an AT&T number]**.

16.     On May 7, 2024, at 6:29PM, C.E. sent the following text to phone number (414) 307-8035:

*"What kinda smoke yo op ass want Michael? My brother not about to play about me, so I can careless*

*what u thinking I'm scared of you a lil nigga that stay making rookie mistakes in your tracks baby we*

*not worried about u at all. U better chill tf out callin me like u the only mf bout that life what are u*

*mad about I don't bother u fool ass boy?!"*

Phone number (414) 307-8035 responded, *"You'll see"*

17.     C.E. also provided MPD video footage from their surveillance system that captured images of two white or light skinned males as they approached the front door of XXXX North 67th Street at approximately 9:29PM on May 7, 2024.  The two males each carried a red container consistent with the appearance of gasoline containers.  The video then captured sudden illumination and rapid fire at and near the front door at approximately 9:30PM.  C.E. initially said they didn't believe the smaller male was SALINAS and didn't know who the other male might be.  However, C.E. would later state to ATF that they reviewed the video again believed the smaller male in the video to be SALINAS.

18.     C.E. further told MPD that SALINAS set fire to his girlfriend's house who they identified as D.M.  A query showed that D.M. was the victim of an arson fire at XXXX North 42nd Street, Milwaukee on February 2, 2024, at approximately 2:59AM (MPD case #C24-0330014).

5

19.     Regarding the fire on May 7th, MPD also recovered surveillance video from an elementary school located across the street from XXXX North 67th Street. The school's surveillance system captured images of the two arson suspects arriving in a black sedan at approximately 9:23PM that parked in an alley north of the fire location. The school's video system also captured one of the suspects lighting the fire at approximately 9:29:52PM, and then both suspects ran back to their vehicle in the alley.

20.     On May 9, 2024, Your Affiant went to XXXX North 67th Street and collected sections of carpet from inside the door and parts of the weather stripping attached under the front door. During the collection process, Your Affiant smelled a distinct odor consistent with the presence of a petroleum distillate.

21.     Also on May 9, 2024, ATF interviewed C.E. at XXXX North 67th Street. C.E. reiterated what they had told police and also said they believed one of the arsonists was their ex-boyfriend, Michael SALINAS. C.E. said they were not home when the fire occurred but saw the damage when they arrived and smelled a strong odor of gasoline near the front door.

22.     C.E. volunteered that they had first-hand knowledge that SALINAS had set fire to D.M.'s home on 2/02/2024. C.E. said they and SALINAS were in bed together at C.E.'s home during the early morning hours of 2/02/2024 when SALINAS began asking to use C.E.'s vehicle so he could go damage D.M.'s house. C.E. said that SALINAS wanted to retaliate against D.M.'s son for damaging SALINAS' mother's house at XXXX North 46th Street on 1/31/2024. C.E. said SALINAS told them that his mother saw D.M.'s son break her front window on 1/31/2024. C.E. further stated that Michael SALINAS was furious about that incident because his children were allegedly at XXXX North 46th Street

6

at that time and were showered with broken window glass. A query of Milwaukee Police Department (MPD) records showed that SALINAS' mom reported the broken window incident under MPD CAD #240310491.

23. C.E. said they saw Michael SALINAS take cocaine and drink a lot of alcohol on 2/01/2024. As he consumed drugs and alcohol, C.E. stated SALINAS became more agitated about D.M's son breaking out the windows at XXXX North 46th Street. C.E. stated they told SALINAS that he had started it by SALINAS breaking out the windows of D.M.'s car days before 1/31/2024. C.E. said SALINAS admitted to them that he had broken out the windows of D.M.'s car. C.E. further said D.M. was an ex-girlfriend to SALINAS and the two of them regularly fought during that timeframe.

24. While lying in bed during the early morning hours of 2/02/2024 with SALINAS at her residence, C.E. said they repeatedly refused his request to use their vehicle in his pursuit of revenge against the D.M family. C.E. stated that SALINAS kept telling her that "Somebody's got to die. My kids were in there." C.E. further said they, at one point, got out of bed to take a shower and when they got out of the shower SALINAS was gone. C.E. said they then looked and saw that their 2008 silver Chevy Equinox (WI plate # XXX-4982) was also gone. C.E. stated they immediately began texting and calling SALINAS telling him to return their vehicle. C.E. showed ATF the text messages they sent to SALINAS on 2/02/2024 that were still on their cellphone. C.E. stated that SALINAS' cellphone number in February 2024 was (414) 629-2275 **(Target Cellphone 1)**, which is a T-Mobile number. The following is a summary of the text messages C.E. sent to SALINAS' cellphone number **Target Cellphone 1** on 2/02/2024:

7

25.     Beginning at 2:20AM, C.E. sent multiple text messages to SALINAS asking him to return their vehicle. C.E. informed SALINAS that they needed their vehicle and that it was their only form of transportation. SALINAS did not text back until after 11:00AM and made no mention of what he had done in those texts. C.E. then sent SALINAS a screenshot of a threating message they had received from (414) 797-5702 warning them that they better kick SALINAS out of their house because they knew he had been driving their vehicle during an arson. C.E. told ATF that they had sent themselves that threatening message in order to persuade SALINAS to move out of their house. C.E. said they created the fake text message via a cellphone application because they didn't want to be in the middle of the feud between SALINAS and the D.M family. C.E. said they were worried that the D.M. family would target their home for revenge if SALINAS continued to stay there. C.E. later said they ultimately told SALINAS that those threatening text messages were fake after it became clear that SALINAS was not going to move out.

26.     C.E. further said they called SALINAS multiple times during the early morning hours of 2/02/2024 after he took their Chevy Equinox. C.E. stated that SALINAS answered one phone call and they could hear that he was pre-paying for gasoline at a gas station. C.E. said they asked SALINAS where he was and SALINAS told them that he was at the Clark gas station near his mother's house (50th and Lisbon). In that phone call, C.E. said SALINAS told them that he planned to use his key to D.M.'s house in order to pour gasoline inside and trap the D.M family.

27.     C.E. stated they called SALINAS again that morning asking him to return their vehicle and they heard SALINAS pouring a liquid. In that phone call, C.E. said

8

SALINAS told them that he had forgotten the keys to the D.M. house so he was pouring the gasoline at the front door. While on the phone with SALINAS when SALINAS was at the D.M. home, C.E. said they overheard an unknown male ask SALINAS what was going on and SALINAS told the man that the man should call the police, which is consistent with a witness interviewed by MPD in which the witness stated they had confronted a Hispanic sounding man who the witness believed had set the fire. C.E. said that SALINAS returned to their home after setting the fire at the D.M. house and SALINAS smelled like gasoline. C.E. further stated that SALINAS was wearing a black hoodie, black pants, and black gloves when he came home.

28. C.E. further said that SALINAS told them that he "fucked up" the fire at the D.M house and it wasn't successful. C.E. stated that SALINAS said he "didn't do it right." C.E. also said that SALINAS claimed his feud with D.M. wasn't over yet. C.E. said SALINAS told them that a man confronted him when he started the fire and the man asked what was going on, and SALINAS told him he didn't know but he should call the police.

29. C.E. stated that SALINAS told them that he had first gone to his mother's house to get a gas can for the D.M. arson and then went to the Clark gas station on 2/02/2024. C.E. said SALINAS brought the gas can with gasoline still in it back to their residence after the arson and stored it in the basement. C.E. stated the gas can was no longer at their house because a friend needed one at some point and took it.

30. C.E. said they recorded the phone call with SALINAS while he was setting fire at the Mendoza home on 2/02/2024. C.E. further stated they recorded the call using their son's cellphone to record themself talking to SALINAS. C.E. attempted to find the

9

recording on their son's cellphone but could not locate it for the agents. C.E. later provided their son's cellphone number as (414) 467-4807 with an iCloud account of mrlouisgonzalez2018@gmail.com.

31. The Milwaukee Police Department located a surveillance camera at MPD District 3 labeled "Courtyard" that faced north and captured images of the Clark gas station on 50th and Lisbon (4950 West Lisbon). Review of that video footage showed that a silver SUV consistent with a 2008 Chevy Equinox pulled into that gas station at approximately 2:26AM on 2/02/2024, and parked at a gas pump. The SUV exited the gas station at approximately 2:29AM. The SUV's front passenger headlight was not working. Your Affiant later asked C.E. via text if one of their headlights was out on her Chevy Equinox and they responded yes. A query of surveillance video at the Clark gas station showed that video footage was no longer available for 2/02/2024.

32. C.E. said they learned on the weekend of 4/27/2024, that SALINAS had restarted a relationship with D.M. so they were fed up with SALINAS. C.E. said by 4/30/2024, they made it clear to SALINAS that they didn't want to be with him and he moved out.

33. C.E. stated they created a fake Facebook account under the profile name "MichaelDownLow" and contacted Michael SALINAS via Facebook from the fake account on 5/07/2024. C.E. showed ATF their contact with Michael SALINAS' Facebook account "Michael Salinas" [Facebook ID #10003425030979]. The Facebook records on C.E.' cellphone showed they began sending messages to SALINAS' account at 12:14PM on 5/07/2024 but SALINAS did not respond. The records also showed that C.E. attempted to call SALINAS via Facebook at 5:15PM. C.E. said they created the fake Facebook page

10

in order to goat and irritate SALINAS because they recently learned he was staying with D.M. again. The messages C.E. sent to SALINAS via the fake Facebook page were now deleted from their cellphone but they stated that the first message they sent to SALINAS at 12:14PM on 5/07/2024 asked SALINAS if D.M. knew SALINAS was responsible for the murder of D.M's nephew. Shortly after they sent that Facebook message, C.E. said SALINAS called their cellphone and stated, "That's what your on." C.E. said she played dumb and pretended to not to know what SALINAS was talking about and insisted it was not them sending him Facebook messages, but he didn't believe them.

34. The following is a summary of information C.E. provided regarding the murder of D.M.'s nephew:

35. When asked to explain why they think that SALINAS was responsible for the murder of D.M.'s nephew, C.E. stated that SALINAS told them he was very angry at D.M.'s nephew because the nephew had put a gun to SALINAS' face and D.M. had to grab the gun from her nephew. C.E. said SALINAS told them that SALINAS had one of his guys respond to D.M.'s house and that guy watched the nephew leave and he followed the nephew home to learn where the nephew lived. C.E. further said the nephew was killed 1-2 days later. C.E. stated that SALINAS admitted he had asked someone to take out D.M.'s nephew.

36. C.E. said SALINAS called them sometime on 1/03/2024 and asked them to pick him up because D.M. had called the cops on him and the cops were looking for him because he had pushed D.M. down and chased her with a knife. (MPD records showed that D.M. called police on 1/01/2024 to report that SALINAS had stolen her vehicle that he was passed out in that vehicle. SALINAS was present when she called the

11

police – MPD case #C24-0010178) When C.E. picked SALINAS up on 1/03/2024, C.E. said SALINAS had them drive by a candle memorial near 37th Street and St. Paul Avenue in Milwaukee and SALINAS said, "Yeah, that nigga dead." C.E. said SALINAS kept looking up online news articles related to the murder of D.M.'s nephew. C.E. said that SALINAS claimed he wanted to get away from D.M. in case she knew he was responsible for the murder. C.E. said they and SALINAS met up with SALINAS' brother, Arnold LNU (Last Name Unknown), at Landmark in Milwaukee later on 1/03/2024. C.E. stated they were present when SALINAS told Arnold that "the guy" was dead and that SALINAS was the one who "got his ass gone." C.E. said Arnold had a different last name than SALINAS.

37.     C.E. later texted Your Affiant a link to a news article that identified D.M.'s murdered nephew as A.M. (DOB: XX/XX/1992). A query of MPD homicide records showed that A.M. and a female were shot to death inside XXX North 37th Street at approximately 12:45PM on December 21, 2023 (MPD case #23-3550061) – approximately one block from 37th and St. Paul.

38.     Agents asked C.E. if one of their arsonists was SALINAS as they claimed, who would be the other arsonist. C.E. said the other arsonist was much bigger than the one they believed was SALINAS and the only person that size that SALINAS hangs out with is his brother Arnold. C.E. described Arnold LNU as very large and light skinned. C.E. located a Facebook page for Arnold with the username "Zen Kahn" [Facebook ID #100001064461133].

39.     C.E. further stated that they talked to D.M. on 5/08/2024, and informed D.M. that SALINAS was responsible for her nephew's murder. C.E. said that D.M.

12

appeared to believe them based on the details that C.E. had regarding the firearm incident with the nephew and knowledge of the murder location.

40. C.E. texted Your Affiant on 5/10/2024 and provided images of SALINAS' brother Arnold. C.E. further said Arnold lived in the upper unit at XXXX West Lisbon and Arnold's cellphone number is (414) 788-5776 **(Target Cellphone 2)**, which is a T-Mobile number. Your Affiant located a second Facebook account for SALINAS' brother Arnold under the username "Maxter Howard (Zen Khan)" and C.E. confirmed that the person in the available profile photograph was the brother of Michael SALINAS. Furthermore, "Maxter Howard" was Facebook friends with Michael SALINAS. Based on birthday messages posted on Maxter Howards' publicly available Facebook page it showed he turned 31 on XX/XX/2021, which made his birthdate XX/XX/1990. A records query showed that an Arnold L. Howard (DOB: XX/XX/1990) was associated with **Target Cellphone 2**. Arnold Howard's Wisconsin DL listed address is XXX North 71st Street, Milwaukee. When asked what vehicle Arnold Howard was known to drive, C.E. located the car they knew Arnold Howard drove and sent an image to Your Affiant that depicted a black Honda 4-door hatchback sedan with WI plate #XXX-7426 that was parked in front of XXXX North 71st Street on 5/10/2024, which is an address known to C.E. as the home of SALINAS' sister.

41. MPD queried license plate #XXX-7426 in the Milwaukee Flock surveillance system and found that same vehicle had been captured on camera traveling northwest on West Fond du Lac Avenue at the intersection of West Capitol Drive in Milwaukee at approximately 9:16PM on 5/07/2024, which is toward the general direction of 5745 North 67th Street. According to Google maps, the approximate travel time from

13

the intersection of West Fond du Lac Avenue and West Capitol Drive to 5745 North 67th

Street is approximately 7 minutes. The surveillance cameras at the elementary school

showed that the arson suspects' dark colored sedan arrived in the alley north of 5745 North

67th Street at approximately 9:23PM on 5/07/2024. C.E. later informed Your Affiant that

they had called Arnold Howard on 5/07/2024 after the fire and told Howard that what

SALINAS would not get away with setting the fire and also told Howard that C.E. was

sending the police to Howard's house. C.E. said they called **Target Cellphone 2** from

phone number (414) 393-8104, which was SALINAS' number that C.E. had bought for

SALINAS but had reclaimed after SALINAS' moved out. C.E. also said Howard sent

C.E. a Facebook message on 5/14/2024, which were provided to ATF. Arnold Howard

sent the messages via his Facebook profile "Zen Khan" [Facebook ID

#100001064461133]. Howard asked C.E. not to send cops to his house anymore. Howard

told C.E. that he understood his brother was on "bullshit" but that wasn't Howard. Howard

further told C.E., "…We been cool the whole time so I'm just tryna keep shit drama free

with us!" C.E. then sent Howard screenshots from the surveillance video that showed the

two arsonists setting fire to the apartment building on 5/07/2024 and told Howard that

whoever set the fire with SALINAS was "dumb" because they were caught on camera.

Howard responded, "I'm sayin something now cuz I wanted to let shit cool off. Like I

said, I'm just trying to keep shit smooth, but I didnt like gettin put in some shit that ain't

have nothin to do with me. I'm too old for the extra shit."

42. Based on the summary of the above-mentioned events, I believe Michael SALINAS

utilized **Target Cellphone 1** to communicate with C.E. while SALINAS prepared for and

subsequently committed an arson at the rental home of D.M on 2/02/2024. I further believe that

14

Arnold Howard likely possessed **Target Cellphone 2** on 5/07/2024 during the commission of the arson at C.E.'s apartment.

43.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

44.     Based on my training and experience, I also know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

15

45. Based on my training and experience, I know that cellular providers, such as T-Mobile, routinely and in their regular course of business maintain historical cell-tower log information, including records identifying wireless communications that were transmitted through a particular cell tower. For each communication, these records may include the telephone call number and unique identifiers for the wireless device that sent or received the communication ("the locally served wireless device"); the source and destination telephone numbers associated with the communication (including the number of the telephone that called or was called by the locally served wireless device); the date, time, and duration of the communication; the cell tower(s) that handled the communication as well as the "sectors" (i.e. the faces of the towers) that received a radio signal from the locally served wireless device; and the type of communication transmitted (such as phone call or text message).

46. Furthermore, cellular providers such as T-Mobile, in their regular course of business maintain certain types of location data associated with a cellular device based on that cellular device's interaction with the cellular network. For these interactions with the cellular network these records may include unique identifiers for the wireless device that interacted with the network ("the locally served wireless device'); the date, time and duration of the interaction with the network; the cell tower and sector (i.e. face of the tower) that was involved; the estimated distance from the tower and sector that the cellular device was located; and the estimated latitude and longitude of the cellular device. This location information is often contained within Timing Advance data, also known as True Call, that is captured and controlled by cellphone service providers.

47. Also based on my training and experience and the above facts, information obtained from cellular service providers such as T-Mobile, reveal cell towers (and, where applicable, sector)

16

that were used and the estimated location information (the estimated distance from the tower and sector and estimated latitude and longitude) of a given cellular device to engaged in a particular communication or interaction with the cellular network can be used to show that the device was in the general vicinity of the cell tower or an estimated location at the time the communication or network interaction occurred.

48.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

AUTHORIZATION REQUEST

49.     Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

50.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result,

17

as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the **TARGET CELL PHONES** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

18

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call numbers: (**"Target Cellphone 1"**): (414) 629-2275 and (**"Target Cellphone 2"**): (414) 788-5776. These records are stored at premises controlled by T-Mobile ("Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

# ATTACHMENT B

## Particular Things to be Seized

All records and information on the Devices described in Attachment A that relate to a violation of Title 18 U.S.C. §§ 844(i) (use of fire to damage property affecting interstate commerce), including for the following time periods:

**Target Cellphone 1** – February 1, 2024, to present for Account listed Attachment A,

**Target Cellphone 2**- May 1, 2024, to present for the Account listed Attachment A;

**A. Subscriber Information and Call Detail Records:** The following information about the customers or subscribers of the Accounts listed Attachment A:

1. Subscriber/customer names (including usernames and screen names);

2. Subscriber/customer addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long-distance call detail and tolls records for the Account;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

20

7. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

B. **<u>Cell-Site/Tower Records:</u>** All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account listed in Attachment A, including:

1. Records of user activity for each connection made to or from the Account, including log files; text messaging logs; the date, time, length, and method of connections; data transfer volume; usernames; and source and destination Internet Protocol addresses (IPV6 data records);

2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as the source and destination telephone numbers, email addresses, and IP addresses); and

3. All data regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received;

4. All historical GPS or other precision location information associated with the Account listed in Attachment A, including Per Call Measurement Data (PCMD), Range to Tower/Real-Time Tool (RTT) data, NELOS records, and Timing Advance Data (TrueCall)).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of the violation of federal law regarding the use of fire to damage property affecting interstate commerce in violation of Title 18, United States Code, Section 844(i).

21